Jerold D. Friedman – SBN: 290434
LAW OFFICE OF JEROLD D. FRIEDMAN
19744 Beach Blvd. #390
Huntington Beach, CA 92648
Telephone: (213) 536-1244
Facsimile: (281) 667-3506

Attorney for Plaintiff,
MICHAEL WEHNER

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION - RIVERSIDE

| | |
|---|---|
| MICHAEL WEHNER,<br><br>       Plaintiff,<br><br>v.<br><br>CITY OF UPLAND, FRIENDS OF UPLAND ANIMAL SHELTER INC., CHRISTINA TOMEO in her individual capacity, LONNA MYERS in her individual capacity, GABRIEL SANTANA in his individual capacity, and DEBBIE PLOGHAUS, in her individual capacity, DOES 1-10, inclusive, each in their individual capacity,<br><br>       Defendants. | CASE NO.: 5:19-cv-1155<br><br>**COMPLAINT**<br><br>**CIVIL RIGHTS ACTION (42 U.S.C. § 1983); AMERICANS WITH DISABILITIES ACT, DECLARATORY RELIEF, PERMANENT INJUNCTION, AND PRELIMINARY INJUNCTION**<br><br>**JURY DEMANDED** |

## I. JURISDICTION AND VENUE

1.     This Court has federal question jurisdiction pursuant to 42 U.S.C. § 1983.

2.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this is a civil action arising under the Constitution of the United States.

3.     This Court has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) as this action seeks to remedy deprivations, under color of law, of Plaintiff's rights guaranteed by the First, Fourth and

Fourteenth Amendments to the Constitution of the United States and the Americans with Disabilities Act.

4.      Plaintiff's claims for declaratory relief and compensatory damages are sought under 28 U.S.C. §§ 2201 and 2202.

5.      Plaintiff seeks preliminary and permanent injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

6.      Plaintiff's claims for attorney's fees and costs are predicated upon 42 U.S.C. § 1988.

7.      Venue is conferred by 28 U.S.C § 1391(b) and is proper in the Central District because the events complained of herein all occurred in this District.

## II.  JURY DEMAND

8.      Plaintiff respectfully demands a trial by jury.

## III.  PARTIES

9.      Plaintiff MICHAEL WEHNER ("WEHNER") is an adult resident of San Bernardino County, California.

10.     Defendant CITY OF UPLAND ("CITY"),

     a.      Is an incorporated city located in San Bernardino County, California.

     b.      Operates the CITY Animal Shelter in partnership with Defendant FRIENDS OF UPLAND ANIMAL SHELTER,

     c.      Can be served with process at: City of Upland, City Clerk Keri Johnson, 460 North Euclid Avenue, Upland, CA 91786.

11.     Defendant FRIENDS OF UPLAND ANIMAL SHELTER ("FRIENDS of UPLAND" or "FRIENDS"),

a. Is a non-profit Internal Revenue Code § 501(c)(3) organization,

b. Operates the CITY Animal Shelter, in partnership with the CITY, located at 1275 San Bernardino Road, Upland, CA 91786.

c. Is directly responsible for all animal sheltering and adoptions at the CITY Animal Shelter.

d. Has, at all times relevant to this action, been responsible for animal care & adoption services for the CITY.

e. Can be served with process at: 1275 San Bernardino Road, Upland, CA 91786.

12. Defendant CHRISTINA TOMEO ("TOMEO"),

a. Is an employee of CITY and at all relevant times herein acted under color of state law.

b. Is an Animal Control Officer for the CITY.

c. Can be served with process at: City of Upland, City Clerk Keri Johnson, 460 North Euclid Avenue, Upland, CA 91786.

d. Is being sued in her individual capacity.

13. Defendant LONNA MYERS ("MYERS"),

a. Is an employee of CITY and at all relevant times herein acted under color of state law.

b. Is an Animal Control Officer for the CITY.

c. Is the supervisor of TOMEO.

d. Can be served with process at: City of Upland, City Clerk Keri Johnson, 460 North Euclid Avenue, Upland, CA 91786.

e. Is being sued in her individual capacity.

14. Defendant GABRIEL SANTANA ("SANTANA"),

    a.    Is an employee of CITY and at all relevant times herein acted under color of state law.

    b.    Is a police officer.

    c.    Can be served with process at: City of Upland, City Clerk Keri Johnson, 460 North Euclid Avenue, Upland, CA 91786.

    d.    Is being sued in his individual capacity.

15. Defendant DEBBIE PLOGHAUS ("PLOGHAUS"),

    a.    Is an employee of San Bernardino County and at all relevant times herein acted under color of state law.

    b.    Is an Assistant District Attorney in San Bernardino County, California;

    c.    Prosecutes cases on behalf of CITY;

    d.    Is being sued in her individual capacity.

16. Defendants DOES 1-10, inclusive, are,

    a.    Are fictious names of persons whose names are presently unknown to WEHNER, who WEHNER alleges participated in or where otherwise involved in WEHNER's injuries as described herein. WEHNER will seek leave to amend this complaint when the names of said persons are discovered.

## V.  STATEMENT OF FACTS

**Defendants had actual notice that Travis is Wehner's Service and Emotional Support Dog**

17. WEHNER,

    a.    Has impairments that substantially limits one or more major life activities.

b.      Is currently diagnosed with ADHD, Depression, Anxiety, Bi-Polar with mania, Mood Disorder, Dyslexia, Dysgraphia, and accompanied by hearing loss.

c.      Lives daily with depression, mood disorder, mania, and at times some psychotic occurrences.

d.      Is qualified as disabled under the Americans with Disabilities Acts.

e.      In 2017 Registered as a Homeless Resident in a CITY's program called Community Restoration Team.

f.      Was homeless from March 2017 to July 2018.

18.     Travis,

a.      Is WEHNER's service and emotional support dog.

b.      Has been trained to do work and perform tasks, which are directly related to WEHNER's disabilities.

c.      Received 2000 hours of service dog training.

d.      Assists WEHNER with his daily life activities.

19.     The thousands of hours of training, reinforcement, and actual on-hands work which Travis received from WEHNER, uniquely trained and perfectly matched this working service dog to suit WEHNER's needs, accommodate his disability, and mitigate his symptoms.

20.     WEHNER specifically trained Travis, as a service dog, in areas such as,

a.      General obedience, advanced obedience;

b.      Crate training,

c.      Avoidance of strangers/food.

d.      To focus, take cues, avoid distractions, and leash work;

e.    Perform tasks known as crowd control (which involved Travis being trained to form a physical barrier with Travis' body between WEHNER and approaching strangers, either from the front or behind WEHNER);

f.    To always stay within touching distance of WEHNER, when WEHNER interacted with the public;

g.    To alert WEHNER to incoming persons and or sounds (by looking at Travis, WEHNER could be made aware of the location of people around or near him, based upon the direction of Travis' head, ears, and eyes);

h.    To sweeps the room to detect intruders, which served to lower WEHNER's paranoia and anxiety;

i.    To provides grounding techniques to lower WEHNER's anxiety responses, which were elicited by the environment and people around WEHNER;

j.    To hold still if Travis' handling equipment failed or somehow became disconnected; and

k.    To understand commands in English.

21.    As early as July 2017, TOMEO and PLOGHAUS had actual notice that Travis was WEHNER's service dog.

22.    WEHNER appeared at a court hearing in late June 2017, at the San Bernardino County Superior Court with his service dog, and TOMEO and PLOGHAUS were in attendance at this hearing.

23.    As early as October 2017, MYERS had actual notice that Travis was WEHNER's service dog, as WEHNER had requested service dog tags from her based upon the Court ordering these service tags to be obtained.

24. PHLOGHAUS was the District Attorney who prosecuted *People v. Wehner* (Case No. MWV17006077, Superior Court of California, County of San Bernardino, filed March 2017).

25. As a term of the plea-agreement of that criminal case, the court ordered WEHNER "to get service dog tags [for Travis] from Upland A.C. free of charge."

26. SANTANA also had actual notice that Travis was WEHNER's service dog and that WEHNER was disabled, in November of 2017.

27. While WEHNER was arrested in November 2017, WEHNER yelled and shouted to SANTANA and TOMEO that Travis was his service dog and that WEHNER had a disability.

28. Prior to November 17, 2018, WEHNER made three unsuccessful attempts to get service dog tags, as required by his probation in Case No. MWV17006077.

29. On the first attempt to get service dog tags, TOMEO,

    a. Told WEHNER that he had to show proof of disability.

    b. Was told by WEHNER that he was not required to show proof of disability.

    c. Was told by WEHNER that the fact that the court ordered them to give him tags, required them to do so.

30. On the second attempt, MYERS told WEHNER that they don't offer service dog tags.

31. On the third attempt,

    a. MYERS told WEHNER that she needed to call PLOGHAUS.

    b. TOMEO told WEHNER he had to leave the premises of the CITY/FRIENDS of UPLAND Animal Shelter.

    c. TOMEO and MYERS called the CITY police.

    d. SANTANA arrived at the CITY/FRIENDS of UPLAND Animal Shelter.

e.      SANTANA ordered WEHNER to leave the CITY/FRIENDS of UPLAND animal shelter.

## Altercation of November 17, 2017

32.   On November 16, 2017, WEHNER rented Room 244 at Guesthouse Inn (a.k.a. Western Inn) at 1191 E. Foothill Blvd, Upland, CA 91786.

33.   During check-in WEHNER registered Travis at the front desk as a certified service animal.

34.   On November 17, 2017, SANTANA,

a.      Knew WEHNER was disabled.

b.      Knew Travis was WEHNER's service dog.

c.      Banged on WEHNER's hotel room door.

d.      Wore a body camera.

e.      Called WEHNER by his full name.

f.      Asked WEHNER to exit the room and come outside.

g.      Saw, initially that WEHNER did not open the door.

h.      Saw WEHNER open the door and exit the room.

i.      Heard WEHNER tell him that Travis is his service dog

j.      Was told by WEHNER that he was disabled.

k.      Heard WEHNER tell him that WEHNER could not be separated from his service dog.

l.      Heard WEHNER tell TOMEO that he could not be separated from his service dog.

m.      Saw that Travis' leash was wrapped around WEHNER's leg.

n.      Separated Travis from WEHNER by cutting-off Travis' leash, with EMT shears.

8

o.      Heard WEHNER say, "No!" to Travis.

p.      Saw that Travis complied with WEHNER's command.

q.      Heard WEHNER tell him that he was having an anxiety attack.

r.      Bound WEHNER's feet together at his ankles and handcuffed his hands in front of his body.

s.      Slammed WEHNER's head into the ground.

t.      Fractured WEHNER's skull.

u.      Injured WEHNER's leg.

v.      Heard WEHNER yelling for help.

w.      Arrested WEHNER for Cal. Penal Code § 459 ("Burglary-Unlawful Entry") and P.C. § 69 ("Resisting Executive Officers").

x.      Heard WEHNER ask him if Travis could ride with WEHNER in the ambulance.

y.      Told WEHNER that Travis could not ride in the ambulance with WEHNER.

z.      Requested in an ambulance to transport WEHNER to the hospital.

aa.     Arrested WEHNER for criminal violations of California Penal Code §69 ("Resisting Executive Officer"); and 2) §459 (Second Degree Commercial Burglary").

bb.     Seized WEHNER's red pouch with paint books, black lunch pail, gray backpack" and Travis' handling equipment (cut collar, cut leash, and harness).

cc.     Seized Travis.

dd.     Transferred possession of Travis to Defendant TOMEO.

35.     On November 17, 2017, TOMEO,

a.      Knew that WEHNER was disabled.

b.      Knew that Travis was WEHNER's service dog.

c.    Heard WEHNER tell her that Travis is a service animal and that WEHNER was disabled.

d.    Heard WEHNER tell SANTANA that Travis is a service animal.

e.    Heard WEHNER tell SANTANA that WEHNER was disabled.

f.    Heard WEHNER tell her and her that he could not be separated from his service dog.

g.    Heard WEHNER tell SANTANA and her that he could not be separated from his service dog.

h.    Cut-off Travis' collar with a pocketknife.

i.    Took possession of Travis from SANTANA.

j.    Heard WEHNER say that he did not consent to Travis being seized.

**False Charges Against Wehner and Conversion of Travis**

36.    On November 21, 2017, PLOGHAUS,

a.    Filed, on behalf of the CITY, a criminal complaint (Case No. FWV17004415) in the Superior Court of California, County of San Bernardino,

b.    Charged WEHNER with violations of California Penal Code §69 ("Resisting Executive Officer"); 2) §597.1(a) ("Failure to Care for an Animal"; 3) §365.7 ("Knowing and Fraudulent Representation as Owner of Service Dog"); and 4) §459 (Second Degree Commercial Burglary").

37.    WENHER was incarcerated in the West Valley Detention Center - from November 17, 2017 to December 19, 2017.

38.    During incarceration WEHNER,

a.    Was still injured as a result of SANTANA fracturing his skull.

b.    Was forcefully medicated with Lithium and Zyprexa.

c. Attempted, several times, to call the CITY/FRIENDS of UPLAND Animal Shelter.

d. Was unable to reach CITY/FRIENDS of UPLAND Animal Shelter, upon information and belief, because the shelter would not accept telephone calls from jail.

e. Wrote a letter to his friend Ronald Johnson, giving him authority to get possession of Travis from the CITY/FRIENDS of UPLAND.

f. Coordinated with his mother, Nancy Wehner, and friend Megan Moret, to retrieve and take possession of Travis.

g. Spoke with the jail psychiatrist about the need to get his service dog back, and his fear of losing him.

h. Made an ADA request to have his service dog with him in jail.

39. While WEHNER was jailed in the West Valley Detention Center, multiple attempts were made by his mother, Nancy Wehner, and his friends Ronald Johnson and Megan Moret, to take possession of Travis.

40. On or about November 25, 2017, WEHNER's mother informed him that she had spoken to SANTANA on the telephone, and he told her that WEHNER would never get Travis back, because Travis was "taken by forfeiture."

41. In November 2017, TOMEO,

a. Heard WEHNER's mother, Nancy Wehner tell her that she had authorization from WEHNER to take possession of Travis.

b. Told Nancy Wehner that Travis was at the CITY/FRIENDS of UPLAND Animal Shelter.

c.      Told Nancy Wehner that Travis was not scheduled to be released, put down or adopted until Michael was released from jail.

d.      Told Nancy Wehner that Nancy Wehner could not take possession of Travis.

e.      Received a voicemail from Megan Moret.

f.      Telephoned Megan Moret on or about November 25, 2017.

g.      Was told by Megan Moret, that WEHNER gave her authority to take possession of Travis.

h.      Told Megan Moret that Travis was unavailable.

i.      Told Megan Moret that Travis was on a hold.

j.      Told Megan Moret that someone else was in line to adopt Travis

k.      Told Megan Moret that Travis was going to be adopted to another person.

l.      Heard Megan Moret ask to be put on the adoption list for Travis

m.      Told Megan Moret that she would be placed second on the adoption list for Travis.

42.      Also in November of 2017, SANTANA told Nancy Wehner that WEHNER would never get Travis back.

43.      On December 8, 2017, TOMEO,

a.      Spoke, in person, to WEHNER's friend Ronald Johnson, at the CITY/FRIENDS OF UPLAND Animal Shelter.

b.      Was shown a letter written from WEHNER to Ronald Johnson.

c.      Made a copy of the letter written from WEHNER to Ronald Johnson.

d.      Saw that the letter gave authorization to Ronald Johnson to take possession of Travis.

e.     Told Ronald Johnson that Travis was at the CITY animal shelter.

f.     Heard Ronald Johnson tell her that he was willing to take Travis.

g.     Asked Ronald Johnson if he had a place for Travis to stay.

h.     Heard Ronald Johnson tell her that that he lives on an acre and a half piece of property and that there is food, water, shelter, and a caring household willing to take him in until WEHNER gets back on his feet.

i.     Told Ronald Johnson that he could not see Travis.

j.     Told Ronald Johnson that she would need to call the District Attorney PLOGHAUS, to see what they could do regarding the situation.

k.     Spoke to PLOGHAUS on the telephone.

l.     After returning from speaking with PLOGHAUS, told Ronald Johnson that Travis was going to be adopted within the next 5 days.

m.     Heard Ronald Johnson tell her that he was the one that should be receiving Travis.

n.     Asked Ronald Johnson if he wanted to be placed on the adoption list for Travis.

o.     Heard Ronald Johnson say that he wanted to adopt Travis

p.     Heard Ronald Johnson state that he should be number one on the adoption list.

q.     Told Ronald Johnson that an employee of the Inland Valley Veterinary Specialist and Emergency Center, was going to adopt Travis.

r.     Told Ronald Johnson that WEHNER's friend Megan Moret was number two on the adoption list.

s.     Heard Ronald Johnson state that Travis was owned by WEHNER.

t.     Heard Ronald Johnson state that they could not do whatever she pleased with Travis.

     u.      Told Ronald Johnson that after a certain amount of time, WEHNER forfeits his

dog to the state.

     v.      Heard Ronald Johnson state that WEHNER never forfeited Travis.

     w.     Heard Ronald Johnson state again, that he should be permitted to take possession

of Travis.

44.     On December 9, 2017, 20-days after Travis was seized, and while WEHNER was still in

jail, MYERS, PLOGHAUS, and TOMEO adopted Travis to an unknown person: DOE.1.

45.     A CITY Kennel record, dated December 9, 2017, at 14:06,

     a.      States in capital letters, "THIS DOG IS ON HOLD UNTIL FURTHER NOTICE,

ANY QUESTIONS, SEE LONNA [MYERS]."

     b.      Contains Travis' microchip number.

     c.      Contains in the "Outcome Information" section entries indicating that Travis was

adopted by a "walkin" on December 9, 2017 at 14.04, which was 2 minutes before 14.06,

the time the kennel record was printed.

46.     On December 12, 2017, on behalf of WEHNER, Attorney Jonathan Tan, mailed a letter

to the CITY/FRIENDS of UPLAND Animal Shelter, informing the CITY that Travis should be

given to WEHNER's friend, Ronald Johnson, until he could be reunited with WEHNER.

47.     In Case No. FWV17004415, PLOGHAUS,

     a.      On December 14, 2017, told WEHNER that he "is not a dog trainer, that (Travis)

is not a service animal, and he would never see Travis again."

     b.      Subpoenaed WEHNER'S medical records from his therapist.

     c.      Was told by the Judge that she was barred from releasing those medical records to

anyone.

        d.      Offered WEHNER multiple plea offers, which would have banned him from owning any animals for three to five years.

48.    On December 19, 2017 WEHNER,

        a.      Pled guilty to two counts, after the State dropped the ban on dog possession.

        b.      Plead guilty to §69 ("Resisting Executive Officer"); and 2) §365.7 ("Knowing and Fraudulent Representation as Owner of Service Dog").

        c.      Plead guilty, under extreme duress and involuntarily, so that he would be released from custody and so that he could get Travis back.

        d.      Was released from jail.

        e.      Was 1) sentenced to probation for 3 years and 60 days in jail, (he had served 30), and credited for time served; 2) was required to "stay away from Upland Animal Control"; and 3) was required to provide proof of mental health counseling by January 30, 2018.

49.    On December 19, 2017, the day he was released from the West Valley Detention Center, WEHNER,

        a.      Telephoned the CITY/FRIENDS OF UPLAND Animal Shelter.

        b.      Left a voicemail message asking when he could get Travis.

50.    On December 22, 2017, TOMEO returned WEHNER's call and,

        a.      Told WEHNER that she did not know where Travis was.

        b.      Told WEHNER that he could not have Travis back.

51.    After WEHNER was released from jail, DOES,

a. Heard WEHNER ask many times, for the return his property, which was seized on November 17, 2018, the day he was arrested and charged with Service Dog Fraud, etc.

b. Told WEHNER that they could not locate WEHNER's red pouch with paint books, black lunch pail, gray backpack" and Travis' handling equipment (cut collar, cut leash, and harness).

c. Told WEHNER he could not have Travis back.

52. On December 30, 2017, eleven days after being released from jail, SANTANA,

a. Stopped WEHNER from walking, and detained him for "not yielding to a pedestrian,"

b. Arrested WEHNER on a warrant for a previous "park after dark" violation.

c. While transporting WEHNER to the West Valley Detention Center Officer, told WEHNER, if he ever said 'service dog' again, that he will be arrested for violating his probation.

53. In February 2018, DOES,

a. Finally returned WEHNER's red pouch with paint books, black lunch pail, gray backpack" and Travis' handling equipment (cut collar, cut leash, and harness).

b. Did not return Travis to WEHNER.

54. In February 2018, WEHNER, entered the CITY/FRIENDS of UPLAND Animal Shelter.

a. To delivered Travis' vaccination records.

b. To deliver a letter from an attorney demanding Travis be returned to WEHNER.

55.     Defendant DOES, arrested WEHNER on February 22, 2018, for violating the terms of

the sentence in Case No. FWV17004415, requiring him to "stay away from Upland Animal

Control."

56.     WEHNER did not know Travis had been adopted until April 9, 2018.

**Wehner Suffers Mental Breakdown due to Defendants' Conversion of Travis and Persecution**

57.     On April 24, 2018, WEHNER suffered a mental breakdown.

58.     On April 24, 2018, the CITY police,

    a.      Detained, and against WEHNER's will, transported WEHNER to the Arrowhead

            Regional Medical Center,

    b.      Involuntarily committed WEHNER into the Department for Behavioral Health on

            a 50-51 three-day hold.

59.     WEHNER was released from Arrowhead Regional Medical Center after 3 days.

60.     The doctor who treated WEHNER at Arrowhead wished him well and told him that he

hoped he would get his service dog back.

61.     The 51-50 hold created the inability for WEHNER to renew his K12 substitute teaching

credentials in the State of California.

**Criminal Court Failed to Return Travis to Wehner**

62.     On March 21, 2018, WEHNER attempted to get Travis back by filing a 'Notice of

Motion and Motion for Return of Property' in Case No FWV17004415, which the court denied

for "lack of jurisdiction."

63.     On April 9, 2018, PLOGHAUS opposed WEHNER's Motion for Return of Property

(Travis),

a.      Arguing that the criminal court did not have jurisdiction over Defendant's motion, because Travis was not seized or confiscated due to the criminal case."

b.      Admitting that Travis was taken for "safe keeping, because [WEHNER] was arrested.

c.      Admitting that Travis was taken "to protect the animal because defendant was arrested."

d.      Stating "[I]n the case of Upland Animal Control, their policy is to hold animals taken for safekeeping due to an arrest of a person for 10 days. After 10 days if no claim is made or the animal control agency is not contacted by the arrestee, the animal is put up for adoption."

e.      Claiming "it is the defendant's burden to give some type of notice to Upland Animal Control. Had Travis been taken for the criminal case then certainly, the notice burden would have been on Upland Animal Control as a law enforcement agency."

f.      Revealing to the Court and WEHNER, that Travis was adopted on December 9, 2017 to a third-party, DOE.1.

g.      Stating, "because Travis was not confiscated or seized pursuant to the criminal case for evidence, this court does not [have] jurisdiction over Upland Animal Control to order the return of Travis."

64.     On April 27, 2018, the criminal court in Case No FWV17004415, denied WEHNER's Motion for Return of Property, because "Court does not have jurisdiction."

65.     On or about May 2018, WEHNER, filed a citizen complaint against Officer SANTANA for interfering with a working service animal.

66. In June of 2018, PLOGHAUS, during the period of time the court had suspended all proceedings due to the Court declaring WEHNER incompetent,

    a. Participated in *ex parte* court proceedings on June 4, 2018, June 5, 2018, and June 14, 2018.

    b. Knew the court had suspended court proceedings on June 19, 2018 (until October 26, 2018) due to WEHNER's "incompetence,"

67. WEHNER had no notice of *ex parte* proceedings held on,

    a. June 4, 2018.

    b. June 5, 2018.

    c. June 14, 2018.

**Wehner's Later Efforts to Have Travis Returned Were Frustrated by Defendants**

68. After Travis was seized by DEFENDANTS on November 17, 2017, WEHNER,

    a. Required extensive mental health and wellness services.

    b. Was not able to function as he did prior to Travis being taken from him.

    c. Experienced increased and worsening symptoms.

    d. Experienced the lowest point of mental health.

    e. Required psychiatric hospitalization.

    f. Received psychiatric care.

    g. Received outpatient psychiatric treatment.

    h. Received outpatient addiction treatment.

    i. Has attended more than 8 months of therapy.

    j. Has been unable to return to work as a self-employed dog obedience trainer.

    k. Has endured significant additional struggles in his life.

l.     Was declared incompetent on June 19, 2018 in Case No. FWV17004415 on June 19, 2018.

m.     Had his legal competency restored on October 26, 2018.

69.     In May of 2018 WEHNER,

a.     Camped out near the CITY/FRIENDS of UPLAND Animal Shelter for five days, with a tent, and picketed the City's seizure of Travis.

b.     Wrote in chalk on the sidewalk outside of CITY/FRIENDS of UPLAND Animal Shelter, that the CITY was committing animal cruelty and theft.

c.     Heard the CITY police tell him he could not protest.

d.     Was forced to leave his protest site by the CITY police.

70.     MYERS and TOMEO called the CITY police because WEHNER was protesting outside the Animal Shelter.

71.     In May of 2018, Defendant DOES,

a.     Initially told WEHNER that he could stay where he was protesting, as long as he did not disrupt traffic or disturb the peace.

b.     Told WEHNER that his signs could not be placed on public property, and they must be held by hand.

c.     Told WEHNER that the chalk writing on the street was vandalism.

d.     After a few days, told WEHNER that camping was illegal inside the city limits and forced WEHNER to leave the protest site.

72.     In September 2018, more than four months after WEHNER files a Citizen Complaint against SANTANA, with the CITY Police, CITY Police Sergeant Dodt,

a.     Contacted WEHNER.

      b.      Requested WEHNER provide him with Travis' service animal certification.

73.      In September 2018, WEHNER provided CITY Sergeant Dodt with Travis's service

animal certification.

74.      WEHNER did not receive any further communication from the CITY pertaining to this

lodged Citizen Complaint.

## IV.    CAUSES OF ACTION

### CAUSE I
### 42 U.S.C. § 1983 - First Amendment
### (Against MYERS and TOMEO)

Under the First Amendment, a citizen has the right to free expression. In order to prove the defendant deprived the plaintiff of this First Amendment right, the plaintiff must prove the following additional elements by a preponderance of the evidence: (1) the plaintiff engaged in speech protected under the First Amendment; (2) the defendant took action against the plaintiff; and (3) the plaintiff's protected speech was a substantial or motivating factor for the defendant's actions.

75.      MYERS and TOMEO called the CITY police because WEHNER was protesting outside

the Animal Shelter.

76.      DOES, MYERS, and TOMEO's conduct deprived WEHNER of his rights under the First

Amendment to the Constitution of the United States.

77.      In May of 2018 protested the seizure of his dog, outside the CITY/FRIENDS of

UPLAND Animal Shelter.

78.      DOES, MYERS, and TOMEO prevented WEHNER from protesting.

79.      WEHNER was deterred from protesting when the police told him he had to leave the

protest site.

80.      DOES, MYERS, and TOMEO intended to interfere with WEHNER's First Amendment

rights.

81.     DOES, MYERS, and TOMEO violated WEHNER'S civil rights.

82.     DOES, MYERS, and TOMEO acted under the color of law.

83.     TOMEO, MYERS, and DOES' conduct violated WEHNER's First Amendment rights.

84.     WEHNER was harmed.

85.     TOMEO, MYERS, and DOES' wrongful acts were a substantial factor in causing

WEHNER's harm.

### CAUSE II
### 42 U.S.C. § 1983 - First Amendment
### Retaliation
### (SANTANA and PLOUGHAUS)

A plaintiff must show that (1) he was engaged in a constitutionally
protected activity, (2) the defendant's actions would chill a person
of ordinary firmness from continuing to engage in the protected
activity and (3) the protected activity was a substantial or
motivating factor in the defendant's conduct.

86.     SANTANA and PLOUGHAUS's conduct deprived WEHNER of his rights under the First

Amendment to the Constitution of the United States.

87.     On November 17, 2017 WEHNER verbally represented to SANTANA that Travis was

his service dog.

88.     WEHNER's representation was/is a protected activity, as he engaged in speech.

89.     WEHNER's service dog is protected expressive activity under the First Amendment.

90.     On November 22, 2017 WEHNER was criminally charged with knowing and fraudulent

representation as owner of service Dog.

91.     PLOGHAUS criminally prosecuted WEHNER for knowing and fraudulent representation

as owner of Service Dog (P.C. §365.7).

92.     In December 2017, PLOGHAUS told WEHNER that he "is not a dog trainer, that Travis

is not a service animal, and he would never see Travis again."

93.     In December of 2017 SANTANA threatened WEHNER, stating, "if you ever say service dog again, you will be arrested for violating your probation."

94.     SANTANA and PLOGHAUS' actions would chill a person of ordinary firmness from possessing a service dog.

95.     WEHNER's representation that Travis was his service dog, was the substantial and motivating factor in SANTANA and PLOGHAUS' conduct.

96.     On or about March 2018, WEHNER petitioned the government for redress by submitting a Citizen Complaint at the CITY police station, against SANTANA, claiming SANTANA interfered with a working service animal.

97.     In April 2018 SANTANA followed and harassed WEHNER as he was walking through a local park.

98.     WEHNER has the right to petition the government for grievances.

99.     SANTANA and PLOGHAUS' actions would chill a person of ordinary firmness from possessing a service dog.

100.    SANTANA and PLOGHAUS' actions would chill a person of ordinary firmness from using the words "service dog."

101.    SANTANA and PLOGHAUS violated WEHNER'S civil rights.

102.    DEFENDANTS acted under the color of law.

103.    DEFENDANTS' conduct violated WEHNER's First Amendment rights to not be retaliated against for protected speech.

104.    WEHNER was harmed.

105.    SANTANA and PLOGHAUS' wrongful acts were a substantial factor in causing WEHNER's harm.

## CAUSE III
### 42 U.S.C. § 1983 - Fourth Amendment
### Excessive Use of Force
### (Against SANTANA)

> To determine whether the use of force was objectively reasonable, the court balances the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.

106.   SANTANA's conduct deprived WEHNER of his rights under the Fourth Amendment to the Constitution of the United States.

107.   On November 17, 2017, SANTANA violated WEHNER's Fourth Amendment rights by banging his head on the pavement while he was being carried, while his feet were bound together at his ankles. and while his hands were cuffed in front of his body.

108.   On November 17, 2017, after SANTANA tied and bound WEHNER's hands and feet.

109.   On November 17, 2017, after SANTANA banged and dragged WEHNER's head on the pavement.

110.   On November 17, 2017, SANTANA fractured WEHNER's skull, and temporarily blinded him in one eye.

111.   SANTANA used force in detaining and arresting WEHNER.

112.   The force used by SANTANA was excessive.

113.   SANTANA's use of excessive force was a substantial factor in causing WEHNER's harm.

114.   WEHNER did not reasonably appear to pose an immediate threat to the safety of SANTANA and others.

115.   WEHNER was not actively resisting arrest.

116.   WEHNER was not attempting to evade arrest by flight.

117.    WEHNER was not committing a violent offense.

118.    WEHNER was attempting to keep his service dog TRAVIS, by his side.

119.    There were less intrusive alternatives to banging WEHNER's head on the pavement while he was being carried, while his feet were bound together at his ankles. and while his hands were cuffed in front of his body.

120.    There were less intrusive alternative to fracturing WEHNER's skull.

121.    SANTANA heard WEHNER shout many times, that Travis was his service dog, and was not to be removed from his possession.

122.    SANTANA knew or should have known that WEHNER was emotionally disturbed and mentally handicapped.

123.    SANTANA had knowledge of WEHNER's mental and emotional state.

124.    SANTANA acted, or purported to act, in the performance of his or her official duties.

125.    SANTANA acted under color of law.

126.    SANTANA's conduct violated WEHNER's Fourth Amendment rights.

### CAUSE IV
### 42 U.S.C. § 1983 - Fourth Amendment
### Unreasonable Seizure of Property
### (Against SANTANA, MYERS, PLOGHAUS and TOMEO)

Under the Fourth Amendment, a person has the right to be free from an unreasonable seizure of his property. In order to prove the defendants deprived the plaintiff of his Fourth Amendment right, the plaintiff must prove the following additional elements by a preponderance of the evidence: 1. Defendants seized the plaintiff's property; 2. in seizing the plaintiff's property, defendants acted intentionally; and 3. the seizure was unreasonable.

In general, a seizure of a person's property is unreasonable under the Fourth Amendment unless the seizure is authorized by a warrant. Under an exception to this rule, a warrant is not required and a seizure of property is reasonable if [set forth applicable exception to warrant requirement]. Thus, in order to prove the

search in this case was unreasonable, the plaintiff must prove by a preponderance of the evidence that this exception does not apply.

127. WEHNER had a right under the ADA to have his service dog with him at all times.

128. The seizure of Travis on November 17, 2017 was unreasonable.

129. By separating and seizing Travis on November 17, 2017, MYERS, PLOGHAUS, SANTANA, and TOMEO's deprived WEHNER of his rights under the Fourth Amendment to the Constitution of the United States when they seized Travis on November 17, 2017.

130. After Travis was seized on November 17, 2017, MYERS, PLOGHAUS, SANTANA, and TOMEO refused to return him to WEHNER and/or his agents.

131. By refusing to return Travis to WEHNER, MYERS, PLOGHAUS, SANTANA, and TOMEO deprived WEHNER of his property in violation of the Fourth Amendment protection against unreasonable seizures.

132. In seizing WEHNER's dog Travis, MYERS, PLOGHAUS, SANTANA, and TOMEO acted intentionally.

133. MYERS, PLOGHAUS, SANTANA, and TOMEO acted under color of law.

134. MYERS, PLOGHAUS, SANTANA, and TOMEO violated WEHNER'S Fourth Amendment right to be free from unreasonable seizure of his property.

**CAUSE V**
**Violation of Title II of the Americans with Disability Act**
**(Against MYERS, PLOGHAUS, SANTANA, and TOMEO)**

To establish a violation of Title II of the ADA, a plaintiff must show that (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability.

135.    WEHNER has disabilities recognized under the Americans with Disabilities Act because he has mental impairments, has a record of mental impairments, and/or is regarded as having mental impairments that substantially limit one or more of the major life activities of WEHNER.

136.    WEHNER is a qualified individual with a disability,

137.    WEHNER has mental impairments that substantially limit one or more major life activities.

138.    MYERS, PLOGHAUS, SANTANA, and TOMEO knew, or had reason to know that WEHNER has a disability.

139.    MYERS, PLOGHAUS, SANTANA, and TOMEO could have made a reasonable accommodation that would have enabled WEHNER to keep Travis.

140.    WEHNER was denied a reasonable accommodation, which he needs in daily life.

141.    The reasonable accommodation requested was that SANTANA and TOMEO, on November 17, 2017, not remove Travis from WEHNER's physical possession.

142.    SANTANA and TOMEO discriminated against WEHNER by denying him his service dog at the time of his arrest.

143.    MYERS, PLOGHAUS, SANTANA, and TOMEO discriminated against WEHNER by depriving him of his service dog from November 17, 2017 to the present.

144.    MYERS, PLOGHAUS, and TOMEO refused to return Travis to WEHNER and his agents.

145.    MYERS, PLOGHAUS and TOMEO refused to issue service dog tags to WEHNER.

146.    MYERS, PLOGHAUS and TOMEO required WEHNER to provide proof of disability when he attempted to get service dog tags.

147.    MYERS, PLOGHAUS, SANTANA, and TOMEO knew WEHNER was disabled.

148. MYERS, PLOGHAUS, SANTANA, and TOMEO knew Travis was WEHNER's service

dog.

149. MYERS, PLOGHAUS and TOMEO were not permitted by law to demand proof of

disability.

150. MYERS, PLOGHAUS, SANTANA, and TOMEO discriminated against WEHNER by

reason of his disability.

**CAUSE VI**
**42 U.S.C. § 1983 - Fourteenth Amendment**
**Due Process**
**(Against All DEFENDANTS)**

A § 1983 claim based on violation of the Fourteenth Amendment's
due process clause has three elements: (1) a liberty or property
interest protected by the Constitution; (2) a deprivation of the
interest by the government; (3) lack of process.

151. DEFENDANT's conduct deprived WEHNER of his rights under the Fourteenth

Amendment to the Constitution of the United States.

152. WEHNER has a property interest in his dog, Travis.

153. DEFENDANTS deprived WEHNER of this interest.

154. WEHNER was provided with no process whereby he could re-obtain his property.

155. DEFENDANTS deprived WEHNER of his property without due process of law.

156. PLOGHAUS, in concert with the county court, in Case No. FWV No. FWV17004415,

conducted hearings without notice to WEHNER and without WEHNER being present.

157. PLOGHAUS, in concert with the county court, in Case No. FWV17004415, conducted

secret hearings, during the timeframe WEHNER was declared incompetent by the County court,

and during the timeframe the court suspended all proceedings.

158.   PLOGHAUS, in concert with the county court, in Case No. FWV17004415, conducted hearings with subpoenaed witnesses, without notice to WEHNER and without WEHNER being present.

159.   DEFENDANTS acted under color of law.

160.   DEFENDANTS' conduct violated WEHNER's Fourteenth Amendment rights to not be deprived of life, liberty or property without due process of law.

**CAUSE VII**
**42 U.S.C. § 1983 - Fourteenth Amendment**
**Equal Protection**
**(Against MYERS, PLOGHAUS, SANTANA, and TOMEO)**

The Equal Protection Clause gives rise to a cause of action on behalf of a "class of one" where the plaintiff does not allege membership in a class or group, but alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for such treatment.

161.   MYERS, PLOGHAUS, SANTANA, and TOMEO's conduct deprived WEHNER of his rights under the Fourteenth Amendment to the Constitution of the United States.

162.   As a term of probation in Case No. MWV17006077, the court ordered WEHNER "to get service dog tags [for Travis] from Upland A.C. free of charge."

163.   Prior to Travis being seized on November 17, 2017, WEHNER made three attempts to get the court ordered service tags for Travis from the CITY.

164.   MYERS, PLOGHAUS, and TOMEO refused to give WEHNER service tags for Travis.

165.   MYERS, SANTANA, and TOMEO ordered WEHNER to leave the CITY/FRIENDS of UPLAND Animal Shelter.

166.   MYERS and TOMEO have issued service dog tags to others, but not to WEHNER.

167.   MYERS, PLOGHAUS, SANTANA, and TOMEO violated WEHNER'S civil rights.

168.   MYERS, PLOGHAUS, SANTANA, and TOMEO acted under color of law.

169.    MYERS, PLOGHAUS, SANTANA, and TOMEO's conduct violated WEHNER's rights

to equal protection.

### CAUSE VIII
### 42 U.S.C. § 1983 - MONELL
### Official Policy, Practice, or Custom/Act of Final Policymaker/
### Ratification/Policy of Failure to Train
### (Against City of Upland)

> In order to prevail alleging liability based on an official policy, practice, or custom, the plaintiff must prove: the policy maker acted under color of law; 2. the act of the policy maker deprived the plaintiff of their particular rights; and 3. the policy maker acted pursuant to an expressly adopted official policy or a longstanding practice or custom of the defendant.

170.    MYERS, PLOGHAUS, SANTANA, and TOMEO acted under color of law.

171.    The acts of MYERS, PLOGHAUS, SANTANA, and TOMEO deprived WEHNER of his

First, Fourth, and Fourteenth Amendment under the United States Constitution.

172.    MYERS, PLOGHAUS, SANTANA, and TOMEO acted pursuant to an expressly

adopted official policy or a longstanding practice or custom of the defendant.

173.    MYERS and PLOGHAUS had final policymaking authority from CITY and FRIENDS

of UPLAND concerning these acts.

174.    When MYERS and PLOGHAUS engaged in these acts, they were acting as a final

policymaker for the CITY and FRIENDS of UPLAND.

175.    MYERS and PLOGHAUS had final policymaking authority from CITY concerning the

acts of SANTANA and TOMEO.

176.    MYERS and PLOGHAUS ratified the acts of SANTANA and TOMEO, and the basis for

those acts, that is, MYERS and PLOGHAUS knew of, and specifically approved the acts of

SANTANA and TOMEO.

177.    The training policies of CITY and FRIENDS of UPLAND were not adequate to train MYERS, PLOGHAUS, SANTANA, and TOMEO to handle the usual and recurring situations with which they must deal.

178.    The CITY and FRIENDS of UPLAND were deliberately indifferent to the obvious consequences of its failure to train MYERS, PLOGHAUS, SANTANA, and TOMEO adequately,

179.    The failure of the CITY and FRIENDS of UPLAND to provide adequate training caused the deprivation of the plaintiff's rights by MYERS, PLOGHAUS, SANTANA, and TOMEO; that is, CITY and FRIENDS of UPLAND failure to train is so closely related to the deprivation of WEHNER's rights as to be the moving force that caused the ultimate injury.

180.    Although FRIENDS of UPLAND is not a state official, the relationship between FRIENDS OF UPLAND and the state was sufficiently close that FRIENDS OF UPLAND was acting under color of state law.

181.    WEHNER was harmed.

182.    DEFENDANTS' wrongful acts were a substantial factor in causing WEHNER's harm.


## VII.  REQUEST FOR RELIEF

183.    WHEREFORE, Plaintiff requests that this Court grant him the following relief:

a.    Adjudge and declare that the conditions, acts, omissions, policies, and practices of Defendants and their agents, officials, and employees are in violation of the rights of Plaintiff under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution, and the American with Disabilities Act;

b.      Enjoin Defendants, their agents, officials, employees, and all persons acting in concert under color of state law or otherwise, from continuing the unlawful acts, conditions, and practices described in this Complaint;

c.      Order Defendants, their agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to develop and implement, as soon as practical, a plan to eliminate the seizure, of disabled persons' service dogs, incident to an arrest.  Defendants' plan, at a minimum, must address deficiencies in c policies and procedures related to this;

d.      Order Defendants, their agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to develop and implement, as soon as practical, a plan which enables a person, whose dog is seized, incident to an arrest, to redeem said dog in a meaningful time and in a meaningful manner.  Defendants' plan, at a minimum, must address deficiencies in c policies and procedures related to this;

e.      Award Plaintiff injunctive relief;

f.      Award Plaintiff declaratory relief;

g.      Grant Plaintiff's Motion for Temporary Restraining Order, and order Defendants to immediately return Travis to WEHNER;

h.      Award Plaintiff, pursuant to 29 U.S.C. § 794, 42 U.S.C. §§ 1988, 12205, and 12133, the costs of this suit and reasonable attorneys' fees and litigation expenses;

i.      Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction;

j.  Award Plaintiff actual and punitive damages for Defendants' violations of

Wehner's Constitutional rights;

k.  Award such other and further relief as the Court deems just and proper.

Dated:  June 22, 2019.

By: _____

Jerold D. Friedman
Attorney for Plaintiff